Michael J. Korda (SBN 88572)
KRAW LAW GROUP, APC
605 Ellis Street, Suite 200
Mountain View, CA 9043
Telephone: (650) 314-7800
Facsimile: (650) 314-7899
mkorda@kraw.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS COATES, An Individual, | Case No.:  3:20-cv-04176-SK |
| Plaintiff, | **(AMENDED) COMPLAINT FOR BENEFITS FOR VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 [29 U.S.C. §§ 1132(a)(1)(B) & (c)]** |
| v. | |
| ATIEVA USA, INC. SEVERANCE BENEFIT PLAN, | |
| Defendant. | |

Now comes the Plaintiff Douglas Coates (hereinafter "Plaintiff"), who for his Complaint alleges as follows:

<u>JURISDICTION</u>

1.      Jurisdiction of this Court is based on the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and in particular, ERISA §§ 502(e)(1) and (f), 29 U.S.C. §§ 1132(e)(1) and (f). Those provisions give the district courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee severance benefit plan. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the district courts jurisdiction over actions that arise under the laws of the United States. Pursuant to ERISA § 502(h), 29 U.S.C. § 1132(h), a copy of this Complaint has been served upon the

1   United States Secretary of Labor, and the United States Secretary of the Treasury.

2                                    VENUE

3          2.      Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), in that the

4   employee benefit plan that is the subject of Plaintiff's claims is administered in this District

5   and/or the breaches described below occurred within the territorial limits of this District and/or a

6   defendant may be found within the territorial limits of this District.

7                                    PARTIES

8          3.      Plaintiff DOUGLAS COATES is, and at all times mentioned herein was, a

9   participant and/or beneficiary, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), in the

10  Atieva USA, Inc's Severance Benefit Plan.  Plaintiff is, and at all times pertinent herein was, a

11  resident of Santa Clara County, California.

12         4.      ATIEVA USA, INC. SEVERANCE BENEFIT PLAN (the "Plan") is, and at all

13  times mentioned herein was, an employee severance benefit plan within the meaning of ERISA §

14  3(1), 29 U.S.C. § 1002(1), administered in Newark, Alameda County, California.

15         5.      The Plan is administered by a Board of Directors of Atieva, Inc., (the "Plan

16  Administrator") which exercises discretion and control over plan assets and plan management,

17  and as such is a fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21). The Board

18  has delegated the administration of the Plan to Michael Carter.

19                              FACTUAL ALLEGATIONS

20         6.      Plaintiff was in charge of the Finance Department for Atieva USA, Inc., doing

21  business as Lucid Motors USA, Inc. Plaintiff was also a Participant in Atieva USA, Inc.'s

22  Severance Benefit Plan, attached hereto as **Exhibit 1** and incorporated herein by this reference.

23         7.      Within twelve (12) months of August 15, 2019, a Change of Control occurred as

24  that term is defined Section 10(b) of Exhibit 1.

25         8.      On and before August 15, 2019, Mr. Coates received both oral and written

26  confirmation that his duties, authority and responsibilities had been materially reduced from what

27  they previously were. The combination of the Change of Control and the material reduction in his

28  duties, responsibilities and Authority meant Coates was entitled to the severance benefits

described in Exhibit 1. The only further action Coates needed to take was to inform the Defendant of the material reduction etc. and give Defendant 30 days written notice to cure the actions it had taken in the material reduction of his duties etc.

9.      On August 21, 2019, Coates, through counsel sent to Defendant such a Notice to Cure. The notice is attached hereto as **Exhibit 2** and incorporated herein by this reference.

10.     On September 17, 2019, Defendant responded via e mail, and through Counsel to Exhibit 2. Defendant took the position there was no Change of Control as defined in Exhibit 1 and Mr. Coates was therefore not entitled to any benefits.  The benefit denial e mail is attached hereto as **Exhibit 3** and incorporated herein by this reference.

11.     On October 7, 2019, Plaintiff, through counsel, sent a letter to Defendant, demanding benefits under Defendant's Severance Benefit Plan.  This letter formally requesting benefits is attached hereto as **Exhibit 4** and Incorporated herein by this reference.

12.     On January 3, 2020, Defendant, through counsel, sent a letter to Plaintiff's counsel denying the benefits requested in Exhibit 4. The January 3, 2020 denial of benefits letter is attached hereto as **Exhibit 5** and incorporated herein by this reference.

13.     On January 10, 2020, Plaintiff, through counsel, sent to Defendant an Appeal of the January 3, 2020 benefit denial, along with a request for documents.  A copy of Plaintiff's appeal and request to review the benefit denial is attached hereto as **Exhibit 6** and incorporated herein by this reference.

14.     After receiving the documents requested, Plaintiff sent a Supplemental Appeal to Defendant on February 20, 2020, a copy of which is attached hereto as **Exhibit 7** and incorporated herein by this reference.

15.     On April 27, 2020, Defendant, through counsel, denied Plaintiff's appeal of the benefit denial. The denial of the appeal is attached hereto as **Exhibit 8**, and incorporated herein by this reference.

## **FIRST CAUSE OF ACTION**

(Claim for Benefits and for Clarification of Rights to

Future Benefits Under the Terms of the Plan pursuant to

COMPLAINT - 3

CASE NO.: 3:20-cv-04176-SK

1    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B))

2    Against All Defendants

3    16.    Plaintiff realleges and incorporates by reference all prior allegations contained in

4    this Complaint, as if fully restated herein.

5    17.    Plaintiff was entitled to the benefits spelled out in Defendant's Severance Benefit

6    Plan, Exhibit 1 to this complaint.

7    18.    Defendant's failure to pay to Plaintiff the benefits he was entitled to as a

8    Participant in the Severance Benefit Plan is, and was, a violation of ERISA (The Employee

9    Retirement Income Security Act of 1974), for which he is entitled to relief.

10    19.    As a result of the violations of ERISA herein alleged, and the Plan's failure to pay

11    benefits to which Plaintiff is entitled, Plaintiff is entitled to monetary recovery pursuant to ERISA

12    § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which permits recovery of benefits due under the

13    terms of an employee benefit plan.

14    20.    Plaintiff is further entitled to a clarification of his rights to future benefits for the

15    same treatment, under the terms of the Plan pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. §

16    1132(a)(1)(B).

17    21.    Plaintiff's appealed the denial of his request for benefits.  His appeal was denied,

18    so he has exhausted his administrative remedies as required under the Plan and ERISA.

19    <u>PRAYER FOR RELIEF</u>

20    WHEREFORE, Plaintiff prays judgment as follows:

21    A.    For an award of benefits under the Plan pursuant to ERISA § 502(a)(1)(B), 29

22    U.S.C. § 1132(a)(1)(B);

23    B.    For an order clarifying Plaintiff's right to future benefits pursuant to ERISA §

24    502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B);

25    C.    For reasonable attorneys' fees and costs incurred by Plaintiff in the prosecution of

26    this action pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

27    D.    For pre-judgment interest and post-judgment interest on any and all amounts

28    awarded to Plaintiff; and

1     E.     For all such other relief as the Court deems appropriate and equitable.

2

3   Dated:  June 24, 2020                                    KRAW LAW GROUP, APC

4

5                                                            /s/ Michael J. Korda

6                                                            Michael J. Korda
                                                             *Counsel for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(Amended)

# Exhibit 1

(Severance Benefit Plan)

DocuSign Envelope ID: 289F5B83-1CF3-4A75-B265-5A73B95Q44B5

**ATIEVA USA, INC.**

**SEVERANCE BENEFIT PLAN**

**1.** **INTRODUCTION.** This Atieva USA, Inc. Severance Benefit Plan (the "***Plan***") is established by Atieva USA, Inc. (the "***Company***"), a Delaware corporation and a wholly owned subsidiary of Atieva, Inc., a Cayman Islands exempted limited liability company (the "***Parent***"), as of April 22, 2019 (the "***Effective Date***"). The Plan provides for severance and change in control benefits to selected U.S. employees of the Company who are designated as participants in the Plan. This document, together with the Participation Notice, constitutes the Summary Plan Description for the Plan.

**2.** **PAYMENTS & BENEFITS.**

**(a)** If there is a Qualifying Termination and the Participant signs a Release within 45 days following the Qualifying Termination and does not revoke the Release as permitted by law, the Company will provide the following payments and benefits, subject to the terms of the Plan, on the 60th day following the Qualifying Termination:

**(i)** **Salary Continuation**. The Company shall continue to pay the Participant, as severance, the Participant's Monthly Base Salary for the number of months set forth in the Participant's Participation Notice in accordance with the Company's standard payroll practices and subject to standard payroll deductions and withholdings, provided that, if the Qualifying Termination is not a Change of Control Termination, such payments shall cease if the Participant commences employment with another employer. On the 60th day following the Qualifying Termination, the Company will make the first payment under this paragraph equal to the aggregate amount of payments that the Company would have paid through such date had such payments commenced on the date of the Qualifying Termination, with the balance of the payments paid thereafter based on the original schedule. If the Qualifying Termination is not a Change of Control Termination, and the Participant commences employment with another employer at a time when cash severance is being paid under this Section 2(a)(i) of the Plan, the Participant must immediately notify the Company of such event.

**(ii)** **Health Insurance Premiums**. If the Participant timely elects continued coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (together with any state law of similar effect, "***COBRA***"), the Company will pay the full amount of the Participant's COBRA premiums, or will provide coverage under the Company's self-funded broad based health insurance plans, on behalf of the Participant, including coverage for the Participant's eligible dependents, in any such case as and when such premiums or coverage amounts would be due if paid for by the Participant, until the earliest to occur of (i) the end of the number of months set forth in the Participant's Participation Notice, (ii) the expiration of the Participant's eligibility for the continuation coverage under COBRA, and (iii) the date when the Participant becomes eligible for substantially equivalent health insurance coverage in connection with new employment or self-employment (such period from the date of the Qualifying Termination through the earliest to occur of the dates set forth in clause (i) through (iii), the "***COBRA Payment Period***"). These payments will be subject to applicable tax withholdings, including as necessary to avoid a violation of, or penalties under, the nondiscrimination rules of Section 105(h)(2) of the Code or any statute or regulation of similar effect (including, without limitation, the 2010 Patient Protection and Affordable Care Act, as amended by the 2010 Health Care and Education Reconciliation Act). On the 60th day following the Qualifying Termination, the Company will make the first payment under this

203439869 v2

DocuSign Envelope ID: 289F5B83-1CF3-4A75-B265-5A73B95D44B5

paragraph equal to the aggregate amount of payments that the Company would have paid through such date had such payments commenced on the date of the Qualifying Termination, with the balance of the payments paid thereafter on the original schedule.  In all cases, if the Participant becomes eligible for coverage under another employer's group health plan or otherwise ceases to be eligible for COBRA during the COBRA Payment Period, the Participant must immediately notify the Company of such event, and all payments and obligations under this paragraph will cease.  Any insurance premiums that are paid by the Company will not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

(iii)    **Accelerated Vesting.**  Each of the Participant's then outstanding and unvested compensatory equity awards from the Parent will vest, and, as applicable, become exercisable, effective as of immediately prior to the Qualifying Termination, as to the percentage of unvested shares per equity award specified in the Participant's Participation Notice.

3.    **PARTICIPATION.**  The Plan Administrator will select the Participants and will deliver a notice to each Participant, substantially in the form attached hereto as the "***Participation Notice***", informing the employee that he or she is eligible to participate in the Plan.  Each employee of the Company who receives a Participation Notice and timely returns a signed copy of the Participation Notice to the Company is a "***Participant***" in the Plan.

4.    **EXCEPTIONS TO ELIGIBILITY FOR BENEFITS; TERMINATION AND/OR RECOUPMENT OF BENEFITS**

(a)    **Exceptions to Benefits.**  Notwithstanding anything to the contrary herein, a Participant will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in either of the following circumstances:

(i)    The Participant has not entered into the Company's standard form of Confidential Information and Invention Assignment Agreement (the "***Confidentiality Agreement***").

(ii)    The Participant has failed to return all Company Property within 10 days after receiving written notice from the Company asking for the return of some or all Company Property.  For this purpose, "***Company Property***" means all material paper and electronic Company documents (and all copies thereof) created and/or received by the Participant during the Participant's period of employment with the Company and other material Company materials and property that the Participant has in the Participant's possession or control, including, without limitation, materials of any kind that contain or embody any proprietary or confidential information of the Company (and all reproductions thereof, in whole or in part).  As a condition to receiving benefits under the Plan, a Participant must not make or retain copies, reproductions or summaries of any such Company documents, materials or property.  However, a Participant is not required to return the Participant's personal copies of documents evidencing the Participant's hire, termination, compensation, benefits and stock options and any other documentation received as a stockholder of the Company.

(b)    **Termination and/or Recoupment of Benefits.**  A Participant's right to receive benefits under the Plan will terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits under the Plan, the Participant, without the prior written approval of the Plan Administrator, (1) willfully breaches a material provision of the Confidentiality Agreement and/or any obligations of confidentiality, non-solicitation, non-disparagement, no

203439869 v2

conflicts or non-competition set forth in the Participant's employment agreement, offer letter or under applicable law; (2) encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or (3) induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees, or other third party to terminate their existing business relationship with the Company or interferes in any other adverse manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee, or other third party.  Further, during the period for which the Participant is receiving benefits under the Plan, the Participant agrees to voluntarily cooperate with the Company by making himself or herself reasonably available without further compensation to assist with any threatened or pending litigation against the Company and any pending patent applications and if a Participant fails to do so, his or her benefits under the Plan will terminate immediately.

5.    CONDITIONS AND LIMITATIONS ON BENEFITS.

(a)    **Prior Agreements.**  By accepting participation in the Plan, the Participant irrevocably waives the Participant's rights to any severance benefits (including vesting acceleration) that would be paid on a Qualifying Termination, including in connection with a Change of Control, under any offer letter, employment agreement or other policy, plan or commitment, whether written or otherwise, with the Company that is in effect on the date the Participant signs the Participation Notice.  The payments pursuant to the Plan are in addition to, and not in lieu of, any accrued but unpaid salary, bonuses or employee welfare benefits to which a Participant is entitled for the period ending with the Participant's Qualifying Termination.

(b)    **Mitigation.**  Except as otherwise specifically provided in the Plan, a Participant will not be required to mitigate damages or the amount of any payment provided under the Plan by seeking other employment or otherwise, nor will the amount of any payment provided for under the Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

(c)    **Indebtedness of Participants.**  If a Participant is indebted to the Company on the effective date of the Participant's Qualifying Termination, the Company reserves the right to offset the payment of any benefits under the Plan by the amount of such indebtedness.  Such offset will be made in accordance with all applicable laws.  The Participant's execution of the Participation Notice constitutes knowing written consent to the foregoing.

(d)    **Parachute Payments.  This section explains what happens if any payments or benefits owed under the Plan are deemed to be "parachute payments" that would be subject to excise tax under the Code.**  Except as otherwise expressly provided in a written agreement between a Participant and the Company, if any payment or benefit the Participant would receive in connection with a Change of Control from the Company or otherwise (a "***Payment***") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code, and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "***Excise Tax***"), then such Payment will be equal to the Reduced Amount.  The "***Reduced Amount***" will be either (A) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax, or (B) the largest portion, up to and including the total, of the Payment, whichever amount (clause (A) or (B)), after taking into account all applicable federal, state, provincial, foreign, and local employment taxes, income taxes, and

the Excise Tax (all computed at the highest applicable marginal rate), results in the Participant's receipt, on an after-tax basis, of the greatest economic benefit notwithstanding that all or some portion of the Payment may be subject to the Excise Tax.  If a reduction in payments or benefits constituting "parachute payments" is necessary so that the Payment equals the Reduced Amount, reduction will occur in the following order: (1) reduction of cash payments; (2) cancellation of accelerated vesting of equity awards other than stock options; (3) cancellation of accelerated vesting of stock options; and (4) reduction of other benefits paid to the Participant.  Within any such category of Payments (that is, clause (1), (2), (3) or (4)), a reduction will occur first with respect to amounts that are not "deferred compensation" within the meaning of Section 409A of the Code and then with respect to amounts that are. In the event that acceleration of vesting of equity award compensation is to be reduced, such acceleration of vesting will be cancelled in the reverse order of the date of grant of the Participant's applicable type of equity award (*i.e.*, earliest granted equity awards are cancelled last).

6.    **TAX MATTERS.**

(a)    **Withholding.**  All payments and benefits under the Plan will be subject to all applicable deductions and withholdings, including, without limitation, obligations to withhold for federal, state, provincial, foreign and local income and employment taxes.

(b)    **Tax Advice.**  By becoming a Participant in the Plan, the Participant agrees to review with Participant's own tax advisors the federal, state, provincial, local, and foreign tax consequences of participation in the Plan.  The Participant will rely solely on such advisors and not on any statements or representations of the Company or any of its agents.  The Participant understands that the Participant (and not the Company) will be responsible for the Participant's own tax liability that may arise as a result of becoming a Participant in the Plan.

(c)    **Application of Code Section 409A.  This section explains how certain Plan provisions will be interpreted and applied in effort to avoid excise tax under the deferred compensation provisions of the Code.**  It is intended that all of the benefits provided under the Plan satisfy, to the greatest extent possible, the exemptions from the application of Section 409A of the Code and the regulations and other guidance thereunder and any state law of similar effect (collectively, "***Section 409A***") provided under Treasury Regulations Sections 1.409A-1(b)(4), 1.409A-1(b)(5), and 1.409A-1(b)(9), and the Plan will be construed to the greatest extent possible as consistent with those provisions. To the extent not so exempt, the Plan (and any definitions in the Plan) will be construed in a manner that complies with Section 409A, and incorporates by reference all required definitions and payment terms.  For purposes of Section 409A (including, without limitation, for purposes of Treasury Regulations Section 1.409A-2(b)(2)(iii)), a Participant's right to receive any installment payments under the Plan will be treated as a right to receive a series of separate payments and, accordingly, each installment payment under the Plan will at all times be considered a separate and distinct payment.  If any of the payments upon a Separation from Service provided under the Plan (or under any other arrangement with the Participant) constitute "deferred compensation" under Section 409A and if the Participant is a "specified employee" of the Company, as such term is defined in Section 409A(a)(2)(B)(i), at the time of the Participant's Separation from Service, then, solely to the extent necessary to avoid the incurrence of the adverse personal tax consequences under Section 409A, the timing of the payments upon a Separation from Service will be delayed as follows: on the earlier to occur of (i) the date that is six months and one day after the effective date of the Participant's Separation from Service, and (ii) the date of the Participant's death (such earlier date, the "***Delayed Initial Payment Date***"), the Company will (A) pay to the Participant a lump sum amount equal to the sum of the payments upon Separation from Service that the Participant would otherwise have

4.

received through the Delayed Initial Payment Date if the commencement of the payments had not been delayed pursuant to this paragraph, and (B) commence paying the balance of the payments in accordance with the applicable payment schedules set forth above. No interest will be due on any amounts so deferred.

7.   CLAWBACK; RECOVERY.   All payments and severance benefits provided under the Plan will be subject to recoupment in accordance with any clawback policy that the Parent is required to adopt pursuant to the listing standards of any national securities exchange or association on which the Parent's securities are listed or as is otherwise required by applicable law. No recovery of compensation under such a clawback policy will be an event giving rise to a right to resign for "good reason," Constructive Termination, or any similar term under any plan of or agreement with the Company.

8.   RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

(a)   **Exclusive Discretion.**   The Plan Administrator will have the exclusive discretion and authority to administer, construe and interpret the Plan and to decide any and all questions arising in connection with the operation of the Plan.

(b)   **Amendment or Termination.**   The Plan Administrator reserves the right to amend or terminate the Plan, any Participation Notice issued pursuant to the Plan or the benefits provided hereunder at any time. Unless terminated sooner by the Plan Administrator, the Plan shall automatically terminate immediately following the day before the fifth anniversary of the date the Plan is adopted by the Board. No such amendment or termination will apply to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan or any Participation Notice will be in writing and executed by a duly authorized officer of the Company and approved by the Plan Administrator.

9.   NO IMPLIED EMPLOYMENT CONTRACT.   The Plan will not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company, or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without Cause, which right is hereby reserved.

10.   DEFINITIONS.   For purposes of the Plan and the form of Participation Notice, and the following terms are defined as follows:

(a)   "*Cause*" shall have the meaning set forth in Section 2(h) of the Parent's 2014 Share Plan as of the Effective Date.

(b)   "*Change of Control*" shall have the meaning set forth in Section 2(i) of the Parent's 2014 Share Plan as of the Effective Date and shall refer to a Change of Control transaction occurring after the Effective Date.

(c)   "*Change of Control Termination*" means (i) an Involuntary Termination Without Cause, or (ii) a Constructive Termination, in either case that occurs within the period starting three months prior to a Change of Control and ending on the first anniversary of the Change of Control.

(d)   "*Code*" means the Internal Revenue Code of 1986, as amended.

(e)   "*Common Stock*" means the common stock of the Parent.

DocuSign Envelope ID: 289F5B83-1C57-4A75-B2B5-5A78D95D44B5

(f)    "*Constructive Termination*" means the Participant resigns (resulting in a Separation from Service) because one of the following events or actions is undertaken without the Participant's written consent:

(i) a reduction of more than 20% or more in the Participant's annual base salary (unless pursuant to a salary reduction program applicable to all similarly situated employees);

(i) a non-temporary relocation of the Participant's business office to a location that increases the Participant's one-way commute by more than 50 miles from the primary location at which the Participant performed duties at the time of Constructive Termination;

(iii) a material breach by the Company or any successor entity of the Plan or any employment agreement between the Company and the Participant; or

(iv) a material reduction of Participant's duties, authority or responsibilities relative to Participant's duties, authority or responsibilities as in effect immediately prior to such reduction, provided that such a "reduction" shall not be deemed to occur if Participant's duties, authority and responsibilities with respect to the successor subsidiary or division of the parent entity following a Change of Control are substantially similar to Participant's duties, authority and responsibilities with respect to the business of the Company or the Parent immediately prior to the Change of Control, and provided further that a mere change of title shall not constitute such a reduction.

An event or action will not give the Participant grounds for Constructive Termination unless (A) the Participant gives the Company written notice within 30 days after the initial existence of the event or action that the Participant intends to resign in a Constructive Termination due to such event or action; (B) the event or action is not reasonably cured by the Company within 30 days after the Company receives written notice from the Participant; and (C) the Participant's Separation from Service occurs within 90 days after the end of the cure period.

(g)    "*Involuntary Termination Without Cause*" means a Participant's involuntary termination of employment by the Company, resulting in a Separation from Service, for a reason other than death, disability, or Cause.

(h)    "*Monthly Base Salary*" means the Participant's monthly base salary in effect immediately prior to date of the Qualifying Termination, ignoring any reduction that forms the basis for Constructive Termination.

(i)    "*Plan Administrator*" means the Board of Directors of the Parent (the "*Board*") or any committee of the Board duly authorized to administer the Plan.  The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

(j)    "*Qualifying Termination*" means a Change of Control Termination or any other Involuntary Termination Without Cause.

(k)    "*Release*" means a general waiver and release substantially in the forms attached hereto as **EXHIBIT A**, which forms may be modified by the Plan Administrator or a designee of the Plan Administrator, in its sole discretion, to comply with applicable law and/or to incorporate the terms into a separation agreement or other written agreement with the Participant.

6.

**(l)**  "*Separation from Service*" means a "separation from service" within the meaning of Treasury Regulations Section 1.409A-1(h), without regard to any alternative definition thereunder.

**11.   LEGAL CONSTRUCTION.**  The Plan will be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*").

**12.   CLAIMS, INQUIRIES AND APPEALS.**

**(a)   Applications for Benefits and Inquiries.**  Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or the applicant's authorized representative).  The Plan Administrator is set forth below.

**(b)   Denial of Claims.**  In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor.  The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

**(1)**  the specific reason or reasons for the denial;

**(2)**  references to the specific Plan provisions upon which the denial is based;

**(3)**  a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

**(4)**  an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA following a denial on review of the claim, as described in Section 12(d).

The notice of denial will be given to the applicant within 90 days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional 90 days for processing the application.  If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial 90-day period.  The notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

**(c)   Request for a Review.**  Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within 60 days after the application is denied.  A request for a review will be in writing and will be addressed to:

Atieva USA, Inc.
Attn: Chief Financial Officer
7373 Gateway Blvd.
Newark, CA 94560

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent.  The applicant (or the applicant's representative) will have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to the applicant's claim. The applicant (or the applicant's representative) will be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the applicant's claim.  The review will take into account all comments, documents, records and other information submitted by the applicant (or the applicant's representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

   **(d)**  **Decision on Review.**  The Plan Administrator will act on each request for review within 60 days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional 60 days), for processing the request for a review.  If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial 60-day period.  This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review.  The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant.  Any electronic notice will comply with the regulations of the U.S. Department of Labor.  In the event that the Plan Administrator confirms the denial of the application for benefits, in whole or in part, the notice will set forth, in a manner designed to be understood by the applicant, the following:

      **(1)**  the specific reason or reasons for the denial;

      **(2)**  references to the specific Plan provisions upon which the denial is based;

      **(3)**  a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

      **(4)**  a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

   **(e)**  **Rules and Procedures.**  The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims.  The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

   **(f)**  **Exhaustion of Remedies.**  No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described above, and (iv) has been notified that the Plan Administrator

DocuSign Envelope ID: 289F5B83-1C57-4A75-B2B5-5A78D95D44B5

has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

**13. BASIS OF PAYMENTS TO AND FROM PLAN.** All benefits under the Plan will be paid by the Company. The Plan will be unfunded, and benefits hereunder will be paid only from the general assets of the Company.

**14. OTHER PLAN INFORMATION.**

(a) **Employer and Plan Identification Numbers.** The Employer Identification Number assigned to the Company (which is the "*Plan Sponsor*" as that term is used in ERISA) by the Internal Revenue Service is 26-1618465. The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 26-1618465.

(b) **Ending Date for Plan's Fiscal Year.** The date of the end of the fiscal year for the purpose of maintaining the Plan's records is December 31.

(c) **Agent for the Service of Legal Process**. The agent for the service of legal process with respect to the Plan is:

> Atieva USA, Inc.
> Attn: Chief Financial Officer
> 7373 Gateway Blvd.
> Newark, CA 94560

(d) **Plan Sponsor and Administrator.** The "Plan Sponsor" of the Plan is the Company, and the "Plan Administrator" of the Plan is as set forth in Section 10(i) of the Plan. All notices and requests should be directed to:

> Atieva USA, Inc.
> Attn: Chief Financial Officer
> 7373 Gateway Blvd.
> Newark, CA 94560

The telephone number for the Plan Sponsor and Plan Administrator is (650) 919-8100. The Plan Administrator is the named fiduciary charged with the responsibility for administering the Plan.

**15. STATEMENT OF ERISA RIGHTS.**

Participants in the Plan (which is a welfare benefit plan sponsored by the Company) are entitled to certain rights and protections under ERISA. Participants in the Plan are considered participants in the Plan for the purposes of this paragraph and, under ERISA, such Participants are entitled to:

### Receive Information About Your Plan and Benefits

(a) Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan and a copy of the latest annual report (Form 5500 Series), if applicable, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;

203439869 v2

**(b)** Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if applicable, and an updated (as necessary) Summary Plan Description. The Plan Administrator may make a reasonable charge for the copies; and

**(c)** Receive a summary of the Plan's annual financial report, if applicable. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Prudent Actions By Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of Participants and other Plan Participants and beneficiaries. No one, including the Participant's employer, union or any other person, may fire a Participant or otherwise discriminate against a Participant in any way to prevent a Participant from obtaining a Plan benefit or exercising a Participant's rights under ERISA.

### Enforcement of Participant Rights

If a Participant's claim for a Plan benefit is denied or ignored, in whole or in part, the Participant has a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps a Participant can take to enforce the above rights. For instance, if the Participant requests a copy of Plan documents or the latest annual report from the Plan, if applicable, and does not receive them within 30 days, the Participant may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the Participant up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If a Participant has a claim for benefits that is denied or ignored, in whole or in part, the Participant may file suit in a state or federal court.

If a Participant is discriminated against for asserting the Participant's rights, the Participant may seek assistance from the U.S. Department of Labor, or the Participant may file suit in a federal court. The court will decide who should pay court costs and legal fees. If the Participant is successful, the court may order the person the Participant has sued to pay these costs and fees. If the Participant loses, the court may order the Participant to pay these costs and fees, for example, if it finds the Participant's claim is frivolous.

### Assistance With Participant Questions

If a Participant has any questions about the Plan, the Participant should contact the Plan Administrator. If the Participant have any questions about this statement or about the Participant's rights under ERISA, or if the Participant needs assistance in obtaining documents from the Plan Administrator, the Participant should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the Participant's telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. A Participant may

also obtain certain publications about the Participant's rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**16.    GENERAL PROVISIONS.**

      **(a)    Notices.**  Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of the Plan will be in writing and will be deemed given when delivered personally, when received electronically (including email addressed to the Participant's Company email account and to the Company email account of the Company's Legal Department), or deposited in the U.S. Mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in above, in the case of a Participant, at the address as set forth in the Company's employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

      **(b)    Transfer and Assignment.**  The rights and obligations of a Participant under the Plan may not be transferred or assigned without the prior written consent of the Company.  The Plan will be binding upon any surviving entity resulting from a Change of Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

      **(c)    Waiver.**  Any party's failure to enforce any provision or provisions of the Plan will not in any way be construed as a waiver of any such provision or provisions, nor prevent any party from thereafter enforcing each and every other provision of the Plan.  The rights granted to the parties herein are cumulative and will not constitute a waiver of any party's right to assert all other legal remedies available to it under the circumstances.

      **(d)    Severability.**  Should any provision of the Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired.

      **(e)    Section Headings.**  Section headings in the Plan are included only for convenience of reference and will not be considered part of the Plan for any other purpose.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

**ATIEVA USA, INC.**
**SEVERANCE BENEFIT PLAN**
**PARTICIPATION NOTICE**

To:Douglas Coates
Date: 7/29/2019 | 5:55:54 PM PDT

You have been designated as eligible to be a Participant in the Atieva USA, Inc. Severance Benefit Plan.  A copy of the Plan document is attached to this Participation Notice.  The terms and conditions of your participation in the Plan are as set forth in the Plan document and this Participation Notice, which together constitute the Summary Plan Description for the Plan.

The table below designates the benefits you are eligible to receive pursuant to the Plan.

|  | **Salary Continuation** | **Maximum Duration of COBRA Payment Period** | **Percentage of Outstanding Unvested Equity Awards That Will Accelerate** |
|---|---|---|---|
| **Qualifying Termination that is *NOT* a Change of Control Termination** | 6 months of your Monthly Base Salary | 6 months | To be determined on an individual basis |
| **Qualifying Termination that is a Change of Control Termination** | 9 months of your Monthly Base Salary | 9 months | 75% |

Terms defined in the Plan document are used to define the benefits to which you are entitled under the Plan.

By accepting participation in the Plan, you represent that you have either consulted your personal tax or financial planning advisor about the tax consequences of your participation in the Plan, or you have knowingly declined to do so.

Please return to the Company a copy of this Participation Notice signed by you and retain a copy of this Participation Notice, along with the Plan document, for your records.



*(Signature)*

Douglas Coates

*(Print Name)*

7/29/2019 | 5:55:54 PM PDT

*(Date)*

**E**XHIBIT **A**

**F**ORM OF **R**ELEASE **A**GREEMENT

**[E**MPLOYEES **A**GE **40** OR **O**VER; **G**ROUP **T**ERMINATION**]**

I have reviewed, I understand, and I agree completely to the terms set forth in the Atieva USA, Inc. Severance Benefit Plan (the "***Plan***").

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company, affiliates of the Company, and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company or an affiliate of the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby acknowledge and reaffirm my obligations under my Confidentiality Agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its affiliates, and its and their parents, subsidiaries, successors, predecessors and affiliates, and its and their partners, members, directors, officers, employees, stockholders, shareholders, agents, attorneys, predecessors, insurers, affiliates and assigns (collectively, the "***Released Parties***"), of and from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to or on the date I sign this Release (collectively, the "***Released Claims***"). The Released Claims include, but are not limited to: (a) all claims arising out of or in any way related to my employment with the Company and its affiliates, or their affiliates, or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company and its affiliates, or their affiliates; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, provincial and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended) ("***ADEA***"), the federal Employee Retirement Income Security Act of 1974 (as amended), the federal Family and Medical Leave Act (as amended) ("***FMLA***"), the California Family Rights Act (as amended) ("***CFRA***"), the California Labor Code (as amended), and the California Fair Employment and Housing Act (as amended).

Notwithstanding the foregoing, I understand that the following rights or claims are not included in my Release (the "***Excluded Claims***"): (a) any rights or claims for indemnification I may have pursuant to any fully executed indemnification agreement with the Company or its affiliate to which I am a party; the charter, bylaws, or operating

agreements of the Company or its affiliate; or under applicable law; (b) any rights or claims which cannot be waived as a matter of law; or (c) any claims for breach of the Plan arising after the date that I sign this Release. In addition, I understand that nothing in this Release prevents me from filing, cooperating with, or participating in any proceeding before the Equal Employment Opportunity Commission, the Department of Labor, or any other government agency, except that I hereby waive my right to any monetary benefits in connection with any such claim, charge or proceeding. I hereby represent and warrant that, other than the Excluded Claims, I am not aware of any claims I have or might have against the Released Parties that are not included in the Released Claims.

I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA, and that the consideration given under the Plan for the waiver and release in the preceding paragraphs hereof is in addition to anything of value to which I was already entitled. I further acknowledge that I have been advised by this writing, as required by the ADEA, that: (a) my waiver and release do not apply to any rights or claims that may arise after the date I sign this Release; (b) I should consult with an attorney prior to signing this Release (although I may choose voluntarily not to do so); (c) I have 45 days to consider this Release (although I may choose voluntarily to sign this Release earlier); (d) I have 7 days following the date I sign this Release to revoke the Release by providing written notice of my revocation to an office of the Company; (e) this Release will not be effective until the date upon which the revocation period has expired, which will be the eighth day after I sign this Release; and (f) I have received with this Release a written disclosure under 29 U.S. Code Section 626(f)(1)(H) that includes certain information relating to the Company's group termination.

In giving the releases set forth in this Release, which include claims which may be unknown or unsuspected by me at present, I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."** I hereby expressly waive and relinquish all rights and benefits under that section and any law or legal principle of similar effect in any jurisdiction with respect to the releases granted herein, including but not limited to the release of unknown and unsuspected claims granted in this Release.

I hereby represent and warrant that: (a) I have been paid all compensation owed and for all time worked; (b) I have received all the leave and leave benefits and protections for which I am eligible pursuant to FMLA, CFRA, the Company's policies, or applicable law; and (c) I have not suffered any on-the-job injury or illness for which I have not already filed a workers' compensation claim.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than 45 days following the date it is provided to me, and I must not subsequently revoke the Release.

**PARTICIPANT:**

_____
*(Signature)*

Printed
Name:
_____

Date:
_____

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

## FORM OF RELEASE AGREEMENT

## [EMPLOYEES UNDER AGE 40]

I have reviewed, I understand, and I agree completely to the terms set forth in the Atieva USA, Inc. Severance Benefit Plan (the "**Plan**").

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company, affiliates of the Company, and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company or an affiliate of the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby acknowledge and reaffirm my obligations under my Confidentiality Agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its affiliates, and its and their parents, subsidiaries, successors, predecessors and affiliates, and its and their partners, members, directors, officers, employees, stockholders, shareholders, agents, attorneys, predecessors, insurers, affiliates and assigns (collectively, the "**Released Parties**"), of and from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to or on the date I sign this Release (collectively, the "**Released Claims**"). The Released Claims include, but are not limited to: (a) all claims arising out of or in any way related to my employment with the Company and its affiliates, or their affiliates, or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company and its affiliates, or their affiliates; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, provincial and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Employee Retirement Income Security Act of 1974 (as amended), the federal Family and Medical Leave Act (as amended) ("**FMLA**"), the California Family Rights Act (as amended) ("**CFRA**"), the California Labor Code (as amended), and the California Fair Employment and Housing Act (as amended).

Notwithstanding the foregoing, I understand that the following rights or claims are not included in my Release (the "**Excluded Claims**"): (a) any rights or claims for indemnification I may have pursuant to any fully executed indemnification agreement with the Company or its affiliate to which I am a party; the charter, bylaws, or operating agreements of the Company or its affiliate; or under applicable law; (b) any rights or claims which cannot be waived as a matter of law; or (c) any claims for breach of the Plan arising after the date that I sign this Release. In addition, I understand that nothing in this Release prevents me from filing, cooperating with, or participating in any proceeding before the Equal Employment Opportunity Commission, the Department of Labor, or any other

government agency, except that I hereby waive my right to any monetary benefits in connection with any such claim, charge or proceeding. I hereby represent and warrant that, other than the Excluded Claims, I am not aware of any claims I have or might have against the Released Parties that are not included in the Released Claims.

In giving the releases set forth in this Release, which include claims which may be unknown or unsuspected by me at present, I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."** I hereby expressly waive and relinquish all rights and benefits under that section and any law or legal principle of similar effect in any jurisdiction with respect to the releases granted herein, including but not limited to the release of unknown and unsuspected claims granted in this Release.

I hereby represent and warrant that:  (a) I have been paid all compensation owed and for all time worked; (b) I have received all the leave and leave benefits and protections for which I am eligible pursuant to FMLA, CFRA, the Company's policies, or applicable law; and (c) I have not suffered any on-the-job injury or illness for which I have not already filed a workers' compensation claim.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than 14 days following the date it is provided to me.

PARTICIPANT:

_____
*(Signature)*

Printed
Name:

_____

Date:

_____

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

# Exhibit 2
(Notice to Cure)



# KRAW LAW GROUP
## A PROFESSIONAL CORPORATION

August 21, 2019

Mr. Ron Lacey
Interim VP of Finance
Atieva USA, Inc.
7373 Gateway Blvd.
Newark, CA 94560

*Re:   Douglas Coates*
*Sent via e mail to ronlacey@lucidmotors.com*

Dear Mr. Lacey:

Please be advised that the undersigned has been retained by Mr. Douglas Coates with respect to his employment at Lucid Motors. I have reviewed Atieva USA, Inc.'s ("Atieva) Severance Benefit Plan, in which Mr. Coates became a participant on April 22, 2019. I have also reviewed the recent changes to his job duties, responsibilities and reporting structure at Atieva/Lucid.

As you know, within the past 12 months, a Change of Control occurred as defined in Section 2(i)(3) of the Parents 2014 Share Plan, insofar as there was a change in the majority shareholder of the Company. Such a Change of Control is one of events that trigger benefits to Mr. Coates under the Severance Benefit Plan noted above. Section 10(b) of the Severance Benefit Plan defines the Change of Control as noted above.

The second trigger for benefits under the Severance Benefit Plan is a "Change of Control Termination". The Severance Benefit Plan defines a "Change of Control Termination" as…(ii) a Constructive Termination…that occurs within the period starting three months prior to a Change of Control and ending on the first anniversary of the Change of Control."

Section 10(f) of the Severance Benefit Plan defines "Constructive Termination." Subsection (iv), the relevant portion states that a constructive termination occurs if actions are undertaken, without the Participant's consent, that result in a "material reduction of Participant's duties, authority or responsibilities relative to Participant's duties, authority or responsibilities as in effect immediately prior to such reduction…"

On Thursday, August 15, 2019, Mr. Coates received written confirmation from Ron Lacey that his duties, authority and responsibilities have been materially reduced from what they were prior to the reduction. Mr. Lacey was recently hired with the title of interim Vice President of Finance, and, according to the Company CEO, Peter Rawlinson, Mr. Lacey was brought in to run the finance department, which had been previously run by Mr. Coates. Mr. Coates was never



consulted on, nor did he consent to being replaced, nor to the material reduction in his duties and responsibilities noted below.

The material reduction in Mr. Coates' duties and responsibilities include, but are not limited to, the accounting department now reporting to Ron Lacey. That department previously reported to Mr. Coates. The Payroll Department will no longer report to Mr. Coates, as it had previously-its members will now report to Tim Sandie, who will report to Ron Lacey. Cap Table Management will no longer report to Mr. Coates as it had prior to August 15, 2019. Mr. Coates himself will now report directly to Ron Lacey, instead of the Company CEO, Peter Rawlinson. There can be no doubt that the above actions are material changes in Mr. Coates' duties and responsibilities, thus triggering a constructive termination as that is defined in Section 10(f)(iv) of the Severance Benefit Plan.

Please consider this letter the 30 day written notice of Constructive Termination as required under Section 10 of the Severance Benefit Plan. Pursuant to the same section, you have 30 days to cure the actions you have taken from your receipt of this notice. Failure to cure will result in Mr. Coates' constructive termination and his entitlement to the benefits outlined in the Severance Benefit Plan Participation Notice attached the main agreement.

Since it seems a remote possibility that such a cure will occur, Mr. Coates is prepared to sign the Release and receive his benefits at an earlier date should you so desire. Please advise.

Very truly yours,

MICHAEL J. KORDA

cc:    Priscilla Siersema- priscillasiersema@lucidmotors.com
       Douglas Coates

# Exhibit 3

(Benefit Denial)

**Michael Korda**

| | |
|---|---|
| **From:** | Bob Shuman <shu@shusny.com> |
| **Sent:** | Tuesday, September 17, 2019 12:11 PM |
| **To:** | Michael Korda |
| **Subject:** | Doug Coates |

Subject to Federal Rule of Evidence 408 and
California Evidence Code Sections 1152 et seq.

Michael:

I have been asked by Atieva USA, Inc. ("Lucid") to respond to your letter of August 21, 2019 regarding Douglas Coates.  Please direct any further communications regarding this matter to me.

While Lucid does not dispute that the financing transaction that closed on or about April 2, 2019 would appear to constitute a Change of Control as defined in the Company's 2014 Share Plan, that financing was not a Change of Control as defined in the April 22, 2019 Severance Benefit Plan in which Mr. Coates is a participant (the "Severance Plan").  Pursuant to Section 10(b) of the Severance Plan, a change of control transaction must occur _after_ the "Effective Date" in order to constitute a Change of Control under the Severance Plan.  The Severance Plan "Effective Date" was April 22, 2019, and thus the (earlier) April 2, 2019 financing was not a Change of Control for purposes of the Severance Plan, and there has been no Change of Control as defined in the Severance Plan since the Effective Date.  As a result, and assuming for purposes of argument only that Mr. Coates' duties and responsibilities have been materially reduced as described in your letter, any such reduction is of no consequence and is not a Change of Control Termination as defined in the Severance Plan.

Based on the foregoing, Lucid is confident that Mr. Coates is not entitled to any severance benefits under the Severance Plan at this time, and Lucid looks forward to Mr. Coates' continued performance of his duties and responsibilities as Lucid's Senior Director of Finance in a professional and satisfactory manner.  Please call me if you wish to discuss any aspect of this matter further.

Regards,
Bob

J. Robert Shuman, Jr.

**Shuman Snyder LLP**
525 Middlefield Road, Suite 140
Menlo Park, CA 94025
Phone: 650.443.5100
Direct: 650.443.5102
Fax:     650.644.3348



This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

Shuman Snyder LLP and its attorneys do not provide tax advice. To comply with IRS regulations, we advise you that any discussion of Federal, State, or local tax issues in this e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code or any taxing authority or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

# Exhibit 4

(Formal Req. for Benefits)

# KRAW LAW GROUP
## A PROFESSIONAL CORPORATION

October 7, 2019

The Board of Directors
Atieva USA, Inc.
c/o J. Robert Shuman
Shuman Snyder
525 Middlefield Rd., Suite 140
Menlo Park CA 94025

*Re:    Douglas Coates*
*Sent via e mail to shu@shusny.com*

Dear Bob:

As you know from our previous communications in this matter, the undersigned has been retained by Mr. Douglas Coates with respect to his employment at Atieva USA, Inc. I am directing this to you as Atieva's representative in accordance with the instructions contained in your September 17, 2019 letter addressed to me. I write this letter to initiate an application for benefits on behalf of Mr. Coates, pursuant to Section 12 of Atieva USA, Inc.'s ("Atieva) Severance Benefit Plan, in which Mr. Coates is a participant. Please pass this application along to the Board of Directors of Atieva USA, Inc.

Mr. Coates was constructively terminated by Atieva USA, Inc. The reasons therefore are stated in my August 21, 2019 letter addressed to Ron Lacey, which we have discussed in detail. Mr. Coates has also informed the company of his constructive termination in his resignation letter dated September 26, 2019.

Having been constructively terminated, Mr. Coates is entitled to severance benefits under Atieva's Severance Benefit Plan ("Plan"). His constructive termination is a Qualifying Termination under the Plan, either as a Change of Control termination, or an Involuntary Termination Without Cause. In your September 17, 2019 letter to me, Atieva has already denied benefits to Mr. Coates based on the Change of Control provisions in the Plan. Notwithstanding the paragraph below, Mr. Coates hereby retains his right to argue that he is entitled to Change of Control benefits under the Plan.

Therefore, please take this letter as an application for benefits based on Mr. Coates Qualifying Termination, i.e. his Involuntary Termination Without Cause (based on his Constructive Termination).

Very truly yours,

MICHAEL J. KORDA



# Exhibit 5
(01.03.20 Denial of Benefits Letter)


SHUMAN
SNYDER

January 3, 2020

**VIA EMAIL AND U.S. MAIL**

RECEIVED

JAN   9 2020

Kraw Law Group, APC

Michael J. Korda
Kraw Law Group, APC
605 Ellis St., Suite 200
Mountain View, CA 94043
mkorda@kraw.com

Re:     **Denial of Application for Benefits**

Dear Michael:

I have been asked by Atieva USA, Inc. (the "Company") to respond to your letter of October 7, 2019, concerning Douglas Coates' application for severance benefits under the Company's Severance Benefit Plan of April 22, 2019 (the "Plan").[1]  For the reasons discussed below, Mr. Coates' application for severance benefits is denied in its entirety.

Your October 7 letter asserts the following:

> Having been constructively terminated, Mr. Coates is entitled to severance benefits under [the Plan].  His constructive termination is a Qualifying Termination under the Plan, either as a Change of Control [T]ermination, or an Involuntary Termination Without Cause.

In fact, Mr. Coates' resignation from his employment with the Company, which was effective October 1, 2019, was not a Qualifying Termination, a Change of Control Termination, nor an Involuntary Termination Without Cause, as each of those phrases is defined in the Plan.[2]

In order to be eligible to receive <u>any</u> severance benefits under the Plan, Mr. Coates had to be subject to a Qualifying Termination. Section 2(a).  A "Qualifying Termination" is defined in Section 10(j) as "a Change of Control Termination or any other Involuntary Termination Without Cause".

---

[1] All Section references contained in this denial letter are to sections of the Plan unless otherwise noted.  A copy of the Plan, along with Mr. Coates' executed Plan Participation Notice, is enclosed for your convenience.

[2] The Company also denies that Mr. Coates' resignation was a "Constructive Termination" as defined in the Plan (Section 10(f)), as his resignation was voluntary and not the result of any of the events/actions described in subsections (i)-(iv) of Section 10(f) of the Plan.

**SHUMAN SNYDER LLP**
525 Middlefield Road, Suite 140, Menlo Park, CA 94025
Tel. 650.443.5100 | www.shusny.com

218082932 v2

Michael J. Korda
January 3, 2020
Page Two

Mr. Coates' resignation was not an Involuntary Termination Without Cause. Such a termination is defined by the Plan as "a Participant's <u>involuntary termination of employment by the Company</u>, resulting in a Separation from Service, for a reason other than death, disability, or Cause." Emphasis supplied, Section 10(g). Mr. Coates was never terminated by the Company—he resigned from his employment—and thus he was not subject to an Involuntary Termination Without Cause.

Nor was Mr. Coates' resignation a Change of Control Termination, which is defined in the Plan as follows: "(i) an Involuntary Termination Without Cause, or (ii) a Constructive Termination, <u>in either case that occurs within the period starting three months prior to a Change of Control and ending on the first anniversary of the Change of Control</u>." Emphasis supplied, Section 10(c). In other words, in order to be subject to a Change of Control Termination, and even if one assumes that Mr. Coates was subject to either an Involuntary Termination Without Cause or a Constructive Termination (which he was not for the reasons discussed above), such termination would have to have occurred within the 15-month Change of Control "window" described in Section 10(c) to qualify as a Change of Control Termination under the Plan. As discussed in the next paragraph, no Change of Control (as defined in the Plan) occurred before or after Mr. Coates' resignation from his employment with the Company.

Section 10(b) states that the phrase "Change of Control" is to have the meaning set forth in Section 2(i) of the Atieva, Inc. 2014 Share Plan (the "Share Plan"), which lists four types of change of control transactions.[3] However, and most importantly, Section 10(b) goes on to note that references to a Change of Control in the Plan "refer to a Change of Control transaction occurring after the Effective Date." The Effective Date is defined in Section 1 as April 22, 2019. Atieva, Inc. has not been subject to a "Change of Control" transaction as defined in the Share Plan since April 22, 2019. As a result, Mr. Coates' resignation on October 1, 2019, did not occur within any Change of Control "window", and thus it could not have been a Change of Control Termination.

Based on the foregoing, the voluntary termination of Mr. Coates' employment relationship with the Company was not a Qualifying Termination, a Change of Control Termination, nor an Involuntary Termination Without Cause, as defined in the Plan, and he is not eligible for any severance benefits under the Plan.

If Mr. Coates wishes to appeal this denial of his application for severance benefits, he (or you on his behalf) should do so by submitting a written request for review within 60 days following the date of this denial letter. The review process is described more fully in Section 12(c)-(d) of the Plan, and any request for review should include the facts, documents, and other information described in Section 12(c). If Mr. Coates submits a written request for review of the denial of his application for severance benefits, and that request for review is denied, he may then file a civil action for such benefits under Section 502(a) of the Employee Retirement Income Security Act of 1974.

---

[3] A copy of the Share Plan is enclosed for your convenience.

Michael J. Korda
January 3, 2020
Page Three


Please contact me if you wish to discuss any aspect of this matter further.

Very truly yours,

SHUMAN SNYDER LLP

*Bob Shuman*

J. Robert Shuman, Jr.

JRS:mem

Enclosures:    Atieva USA, Inc. Severance Benefit Plan
               Atieva, Inc. 2014 Share Plan

# Exhibit 6
(Appeal and Request to Review)

# KRAW LAW GROUP
## A PROFESSIONAL CORPORATION

January 10, 2020

J. Robert Shuman, Esq.
Shuman Snyder
525 Middlefield Rd., Suite 140
Menlo Park CA 94025

Re:     Douglas Coates
*Sent via e mail to* shu@shusny.com

Dear Bob,

I am in receipt of your letter dated January 3, 2020, which was received by me via e mail on January 4, 2020.  The letter, sent on behalf of Atieva USA, Inc. (the "Company"), denies Mr. Coates' October 7, 2019 application for severance benefits in its entirety.

Mr. Coates hereby requests review of the January 3, 2020 decision pursuant to section 503 of the Employee Retirement Income Security Act, 29 U.S.C. § 1133.

In order to perfect his appeal and to ensure he receives a full and fair review of his claim, Mr. Coates hereby requests that you provide copies of all documents relied on, generated, or considered in rendering the adverse determination with respect to his claim. This request includes, but is not limited to, all claim notes, memoranda (including attorney work product), email correspondence, text messages, letters, faxes, and any other document relating to the investigation and decision on Mr. Coates' claim. Mr. Coates' request specifically includes any communications between the Company and its former and/or current officers and directors regarding the Atieva USA, Inc. Severance Benefit Plan (the "Plan"), its purpose with respect to the Financing event that occurred in April 2019, as well as the implementation of the Plan. Please also include any documents indicating other Plan participants who have made claims under the Plan, and the outcome of those claims.

Mr. Coates intends to supplement his request for review with additional comment and evidence following receipt of these documents.  Since there is a 60 day limit on perfecting the appeal, and since Mr. Coates intends to use these documents in so doing, please produce them by January 24, 2020.

Very truly yours,

MICHAEL J. KORDA

 **SHUMAN SNYDER**

January 24, 2020

**VIA EMAIL AND U.S. MAIL**

RECEIVED

JAN 2 7 2020

Kraw Law Group, APC

Michael J. Korda
Kraw Law Group, APC
605 Ellis St., Suite 200
Mountain View, CA 94043
mkorda@kraw.com

**Re:     Douglas Coates**

Dear Michael:

I am in receipt of your letter of January 10, 2020, concerning Mr. Coates' request for a review of Atieva USA, Inc's (the "Company") denial of his October 7, 2019 claim for benefits under the Company's Severance Benefits Plan of April 22, 2019 (the "Plan"). In accordance with Mr. Coates' request, the Company will conduct a review of its earlier determination, and respond to you in a timely manner.

In terms of your request for "documents relied on, generated, or considered" in making the initial determination of Mr. Coates' claim, I am unaware of any such non-privileged documents other than the two documents that were provided to you with my letter of January 3, 2020—the Plan and the Atieva, Inc. 2014 Share Plan--and Mr. Coates' September 27, 2019 notice of resignation from his employment with the Company, a copy of which is attached.

Please let me know if you intend to supplement Mr. Coates' request for review of the Company's earlier determination, or if your letter of January 10, 2020, should be treated as the entire request for review, so that we may provide a timely response to his request.

Very truly yours,

SHUMAN SNYDER LLP

*Bob Shuman*

J. Robert Shuman, Jr.

JRS:mem

Enclosures:  Coates Resignation Email

**REDACTED**

**From:** Douglas Coates <DouglasCoates@lucidmotors.com>
**Sent:** Friday, September 27, 2019 11:09:33 AM
**To:** Priscilla Siersema <PriscillaSiersema@lucidmotors.com>; Ron Lacey <RonLacey@lucidmotors.com>
**Cc:** Andrea Tsai <AndreaTsai@lucidmotors.com>
**Subject:** Coates - resignation

September 27, 2019

I hereby submit my resignation from employment at Atieva USA, Inc. effective at the end of the business day on Tuesday October 1, 2019. My resignation is a Constructive Termination (resulting in a Separation of Service), and a Qualifying Termination as those terms are defined in Sections 10 (f) and (j) of Atieva's Severance Benefit Plan dated April 22, 2019, of which I am a Participant.

As you know, on August 21, 2019, you received a letter from my attorney explaining why I believed I had been subject to a Constructive Termination. Atieva was given the opportunity to cure the condition within the 30-day period outlined in Section 10 (f) of Atieva's Severance Benefit Plan. Atieva has done nothing to cure the circumstances leading to my Constructive Termination. Thirty days has passed, so I hereby submit this resignation.

My attorney will contact your attorney to work out the benefits I am entitled to under the Severance Benefit Plan.

_____
DOUGLAS COATES

# Exhibit 7
(Supplemental Appeal)



## KRAW LAW GROUP
### A PROFESSIONAL CORPORATION

February 20, 2020

*Sent via e mail to* <u>shu@shusny.com</u>

J. Robert Shuman, Esq.
Shuman Snyder
525 Middlefield Rd., Suite 140
Menlo Park CA 94025

*Re:*     *Douglas Coates*

Dear Bob,

This letter supplements Mr. Coates' request for review of the January 3, 2020 decision denying his claim for benefits pursuant to section 503 of the Employee Retirement Income Security Act, 29 U.S.C. § 1133. This also is to inform you that we received the documents you produced pursuant to our previous request on February 14, 2020.  Below please find our supplemental comments to Mr. Coates' appeal:

**The Denial of Mr. Coates' Claim Based on Atieva's Interpretation of the Definition of "Change of Control" in Section 10(b) of the Plan is Incorrect.**

Atieva USA, Inc. denied Mr. Coates' claim that he was due benefits as the result of a "Change of Control Termination" based upon its contention that there was no "Change of Control" as that term is defined in Section 10(b) of the Plan.  Atieva contends the transaction that constituted a change of control occurred on April 2, 2019.  Atieva further contends that the term "Effective Date" in Section 10(b) refers to the Effective Date of the Severance Benefit Plan, which was April 22, 2019. Atieva concludes that based upon that sequence of dates, the Change of Control did not take place after the Effective Date, and therefore there was no Change of Control as defined in the Plan.  The company further concludes that there being no Change of Control as defined under the Plan, there was not a Qualifying Termination of Mr. Coates' employment, so he is not entitled to benefits for a Change of Control Termination as defined in Section 10(c) of the Plan.

Mr. Coates respectfully submits that Atieva has misread and misinterpreted the Plan. Section 10(b) states that…"Change of Control shall have the meaning set forth in Section 2(i) of the Parent's 2014 Share Plan s of the Effective Date and shall refer to a Change of Control transaction occurring after the Effective Date."  The **only** agreement referred to in Section 10(b) of the Severance Benefit Plan is the **Parent's 2014 Share Plan**."  The Effective date of the Parent's 2014 Share Plan is May 14, 2014 (See, Section 6 of the Atieva 2014 Share Plan).  The



J. Robert Shuman, Esq.
February 20, 2020
Page **2** of **3**

only Effective Date referenced is therefore the effective date of Atieva's 2014 Share Plan. The Change of Control referenced in Section 10(b) of the Severance Benefit Plan (which closed on April 2, 2019), occurred after the Effective Date, May 14, 2014.  So, there was a Change of Control as that term is defined in Section 10(b) of the Severance Benefit Plan.

There was a "Change of Control" as defined in Section 10(b) of the Plan.  There was also a Change of Control Termination as defined in Section 10(c) of the Severance Benefit Plan. The Plan has submitted no credible issue taken with Mr. Coates' contention that he was constructively terminated, nor has the Plan presented any evidence presented to the contrary.

Therefore, Mr. Coates is entitled to the Change of Control termination benefits as those benefits are outlined in the Plan. This is especially true given that benefit plans, such as the one at issue here, are to be interpreted under provisions of ERISA, in favor of the putative beneficiary's receipt of such benefits.

**The Plan's Conclusion That Mr. Coates' Separation From Service Was Not An "Involuntary Termination Without Cause" Is Contrary To The Terms of The Plan.**

The Plan entitles a Participant to certain severance benefits if one of two events occur, either of which is a "Qualifying Termination" under Section 10(j) of the Plan. The first event is a "Change of Control Termination" discussed above.  The second is "any other Involuntary Termination Without Cause". (Section 10(j) of the Plan) The benefits for the two types of Qualifying Terminations are different. Involuntary Termination Without Cause is defined in Section 10(g) of the Plan as "a Participant's involuntary employment of employment by the Company, resulting in a Separation from Service, for a reason other than death, disability, or Cause."

The Plan is taking the position that Mr. Coates' constructive termination is not an involuntary termination without cause because it was not a termination initiated "by the Company". This is a distinction without a difference.  If one assumes that Mr. Coates was constructively terminated, it was clearly because the Company undertook, without Mr. Coates' written consent, one or more of the actions described in Paragraph 10(f) of the Plan, a paragraph that defines with precision what actions **by the Company** constitute a constructive termination.  A constructive termination does not occur in a vacuum.  It occurs because the Company engages in pro-active conduct that meets the definition.  Thus, if one agrees that Mr. Coates was constructively terminated, he was, by the very definition of the term dismissed "by the Company".

The law is also clear that a constructive termination is an involuntary termination without cause, by a different name.  The seminal case on constructive termination in California is *Turner v. Anheuser-Busch, Inc.* 7 Cal.4th 1243 (1994): "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign.  Although the employee may say 'I quit', the employment relationship **is actually severed by the employer's acts, against the employee's will**.  As a result, a constructive discharge is legally regarded as a firing rather than a resignation." *Id., at 1244-45(emphasis added)*.

To now say that Mr. Coates is not entitled to benefits under the Plan because the Company did not say "You're fired", is simply contrary both to the language of the agreement and the law. Mr.

J. Robert Shuman, Esq.
February 20, 2020
Page **3** of **3**

Coates' termination fits the definition contained in the Plan to a tee.  His employment was
terminated involuntarily by the Company (whether by words or deeds), it resulted in a Separation
from Service and it was not for cause. As a named Participant, Mr. Coates is entitled to the
benefits outlined in the Plan.

By submitting this appeal, we hope you overturn the previous incorrect and unjust denial of Mr.
Coates' Plan benefits.  Should you uphold the previous denial, please be advised Mr. Coates will
immediately file suit in federal court, seeking the full array of damages available to him under
ERISA, including attorneys' fees.

Very truly yours,

MICHAEL J. KORDA

(Amended)

# Exhibit 8

(Denial of Appeal)



April 27, 2020

**Via Email and U.S. Mail**

Michael J. Korda
Kraw Law Group, APC
605 Ellis St., Suite 200
Mountain View, CA 94043
mkorda@kraw.com

**Re:     Decision Following Review of Denial of Application for Benefits**

Dear Michael:

I write in response to your letters of January 10 and February 20, 2020 (the "Letters"), setting forth Douglas Coates' request for review of Atieva USA, Inc.'s (the "Company") denial of his October 7, 2019 application for severance benefits under the Company's Severance Benefit Plan of April 22, 2019 (the "Plan").[1]  Based upon that request, Michael Carter, the Plan Administrator, has re-reviewed Mr. Coates' initial application for benefits under the Plan (October 7, 2019), and has also considered each of the bases for the requested review of the denial of that application set forth in the Letters.  Following that review, Mr. Carter has confirmed the denial of Mr. Coates' application for benefits under the Plan in its entirety.  The reasons for his confirmation of that denial are discussed below.

<u>Initial Application for Benefits (October 7, 2019): Alleged Change of Control
Termination or Involuntary Termination Without Cause</u>

In his initial application for severance benefits under the Plan, Mr. Coates claimed that he was entitled to such benefits because, as a result of his resignation from employment with the Company on October 1, 2019, he had been subject to a Change of Control Termination or an Involuntary Termination Without Cause.  However, Mr. Coates' resignation was neither a Change of Control Termination nor an Involuntary Termination Without Cause.

A Change of Control Termination is defined in the Plan as follows: "(i) an Involuntary Termination Without Cause, or (ii) a Constructive Termination, <u>in either case that occurs within the period starting three months prior to a Change of Control and ending on the first anniversary of the Change of Control</u>." Emphasis supplied, Section 10(c).  In short, there must be a "Change of Control" in order for a Change of Control Termination to occur (and then only if the termination occurs within the 15-month Change of Control "window" described in Section 10(c)).  No Change

---

[1] All Section references contained in this letter are to sections of the Plan unless otherwise noted, and capitalized terms/phrases used in this letter are defined as set out in the Plan unless otherwise noted.

**SHUMAN SNYDER LLP**
525 Middlefield Road, Suite 140, Menlo Park, CA 94025
Tel. 650.443.5100 | www.shusny.com

Michael J. Korda
April 27, 2020
Page Two

of Control occurred prior to, or within three months following, Mr. Coates' resignation from his employment with the Company.

Based on subsequent communications between us (including your letter to me of February 20), Mr. Carter understands that Mr. Coates contends that a Change of Control occurred on April 2, 2019, and that his separation from the Company approximately six months later was a Change of Control Termination that entitles him to severance benefits under the Plan. However, the transaction that occurred on April 2, 2019 was not a Change of Control for purposes of the Plan because Section 10(b) states that references to a Change of Control in the Plan "refer to a Change of Control transaction <u>occurring after the Effective Date</u>." Emphasis supplied. The Effective Date is specifically defined in Section 1 as April 22, 2019, and any transaction that occurred on April 2, 2019 was not a Change of Control for purposes of the Plan because it preceded the Effective Date. As a result, Mr. Coates' resignation on October 1, 2019 did not occur following a Change of Control (or within three months preceding such an event), and thus was not a Change of Control Termination.

Nor was Mr. Coates' resignation an Involuntary Termination Without Cause. Such a termination is defined by the Plan as "a Participant's <u>involuntary termination of employment by the Company</u>, resulting in a Separation from Service, for a reason other than death, disability, or Cause." Emphasis supplied, Section 10(g). Mr. Coates was not involuntarily terminated by the Company— he resigned from his employment—and thus he was not subject to an Involuntary Termination Without Cause. (See below for further discussion regarding Mr. Coates' contention that he was constructively discharged by the Company.)

<u>Request for Review of Denial of Benefits (February 20, 2020): Alleged Incorrect Interpretation of the Phrase "Effective Date" in the Plan</u>

In your letter of February 20, you assert that the term "Effective Date", as it is used within Section 10(b) of the Plan, should be defined as it is defined in the Atieva, Inc. 2014 Share Plan (the "Share Plan"), rather than as it is defined in Section 1 of the Plan. As you point out, if that were true, then the Plan's reference in Section 10(b) to "a Change of Control transaction occurring after the Effective Date" would mean any such transaction occurring after May 14, 2014 (the Share Plan "Effective Date"), including the April 2, 2019 transaction on which Mr. Coates bases his claim that his resignation was a Change of Control Termination. However, this assertion is contrary to the unambiguous language of the Plan, which makes it clear that the Effective Date of the Plan is April 22, 2019, and not May 14, 2014:

- In the first sentence of Section 1 of the Plan, the Effective Date is expressly defined as "April 22, 2019", and not "May 14, 2014";

- Outside of Section 1, the only references in the Plan to "Effective Date" are contained in Sections 10(a) and 10(b), which include the same language you point to in support of this assertion—"…shall have the meaning set forth in Section 2(h) [OR] (i) of the Parent's 2014

Michael J. Korda
April 27, 2020
Page Three

Share Plan as of the Effective Date…"; if the Plan's intent was to "borrow" the Share Plan's definition of "Effective Date", there was no purpose in defining that phrase in Section 1 of the Plan <u>since it is not used in the Plan other than in Sections 10(a) and (b)</u>;

- The language of Sections 10(a) and (b) make it clear that those sections are defining the terms "Cause" (Section 10(a)—"**Cause** shall have the meaning…") and "Change of Control" (Section 10(b)—"**Change of Control** shall have the meaning…"), and not the term "Effective Date";

- Given the construction of Sections 10(a) and (b), <u>which are the only Sections of the Plan that "borrow" definitions from the Share Plan</u>, it is apparent that if the Plan wanted to "borrow" the Share Plan's definition of "Effective Date", the Plan would not have defined that term in Section 1, and would instead have included the following additional definition as Section 10(g):  "**Effective Date**" shall have the meaning set forth in Section 6 of the Parent's 2014 Share Plan as of the Effective Date"; no such additional definition is included in the Plan; or

- Had the Plan intended to "borrow" the Share Plan's definition of Effective Date in Section 10(b) for the limited purpose of determining when a "qualifying" Change of Control occurred under the Plan, and ignore the explicit and earlier definition of that phrase in Section 1, one assumes that the Plan would have clearly stated that exception, e.g., "…shall refer to a Change of Control transaction occurring after the Effective Date *(as defined in the Parent's 2014 Share Plan)*"; no such "exception" language is included in the Plan.

In view of these facts, there is no basis to conclude that the phrase "…a Change of Control transaction occurring after the Effective Date" in Section 10(b) of the Plan was referring to an Effective Date of May 14, 2014, rather than the Plan's expressly-defined Effective Date of April 22, 2019.

<u>Request for Review of Denial of Benefits (February 20, 2020): Alleged Constructive Termination as Defined in the Plan</u>

In further support of his request for review of the denial of his application for severance benefits, Mr. Coates contends (on pages two and three of your February 20 letter) that (a) he was subject to an Involuntary Termination Without Cause because he was subject to a Constructive Termination (as defined in Section 10(f)) by the Company, and/or, (b) he was subject to an Involuntary Termination Without Cause because he was "constructively discharged" by the Company under California law as defined in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1243.  With respect to (a) ((b) is addressed in the following section), even if Mr. Coates was subject to a Constructive Termination, he is not entitled to any severance benefits under the Plan.

As you correctly note in your February 20 letter, Mr. Coates is entitled to severance benefits under the Plan "if one of two events occur, either of which is a 'Qualifying Termination' under Section

Michael J. Korda
April 27, 2020
Page Four

10(j) of the Plan"—a Change of Control Termination or an Involuntary Termination Without Cause.  As noted in the first section above, a Change of Control Termination is expressly defined by the Plan to include either an Involuntary Termination Without Cause <u>or a Constructive Termination</u>, so long as such termination occurs within the applicable 15-month Change of Control Termination period.  (As is also noted in that first section above, no Change of Control has occurred as of yet that could give rise to a Change of Control Termination of Mr. Coates.)

As for the contention that Mr. Coates has suffered an Involuntary Termination Without Cause based upon his alleged Constructive Termination on October 1, 2019, even if one assumes for purposes of this review only that his resignation was a Constructive Termination, that would not entitle him to any severance benefits under the Plan, because an Involuntary Termination Without Cause (as defined by the Plan at Section 10(g)) <u>does not include a Constructive Termination</u>.  Had the Plan been intended to provide severance benefits in that situation, it would have expressly listed a Constructive Termination as a type of Involuntary Termination Without Cause in Section 10(g), just as it specifically listed a Constructive Termination as a type of Change of Control Termination in Section 10(c). Accordingly, Mr. Coates could not suffer an Involuntary Termination Without Cause based on an alleged Constructive Termination.

<u>Request for Review of Denial of Benefits (February 20, 2020): Alleged Constructive Discharge Under California Law</u>

Although a Constructive Termination under the Plan is not an Involuntary Termination Without Cause, the final point raised in your February 20 is well taken: it is possible that Mr. Coates' October 1, 2019, resignation could be deemed an involuntary termination under California common law (and thus potentially an Involuntary Termination Without Cause) if he was subject to a "constructive discharge" by the Company as defined in the *Turner* case.  However, the *Turner* case itself makes it quite clear that Mr. Coates was not constructively discharged by the Company.

As described in your letter to me of August 21, 2019 (and confirmed in Mr. Coates' resignation email to the Company of September 27, 2019), Mr. Coates believe that he was constructively discharged by the Company solely because he was subject to an alleged material reduction of his duties, authority, or responsibilities.  Even if such a reduction did occur, it would not constitute a constructive discharge:

> In order to constitute a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable…Moreover, a poor performance rating <u>or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge.</u>

*Id.* at 1247; emphasis supplied, cites and footnotes omitted.

Michael J. Korda
April 27, 2020
Page Five

In this instance, even if Mr. Coates' duties, authority, and/or responsibilities were materially reduced, he still falls well short of even the <u>failing</u> constructive discharge standard enunciated in *Turner* that is quoted above: Mr. Coates was not demoted by the Company (his title did not change), and his compensation was not reduced by the Company.  Accordingly, and pursuant to the explicit language of *Turner*, Mr. Coates was not constructively discharged by the Company.

<u>Conclusion</u>

Based upon the information set forth above, Mr. Carter hereby confirms the denial of Mr. Coates' application for benefits under the Plan in its entirety.

Pursuant to Section 12(d)(3) of the Plan, Mr. Coates is entitled to receive, upon request by you or he, and free of charge, reasonable access to, and/or copies of, all documents, records, and other information relevant to his claim for benefits under the Plan, as well as his request for review of the Company's denial of that claim.  In addition, as a result of the denial of his claim, Mr. Coates may file a civil action for such benefits under Section 502(a) of the Employee Retirement Income Security Act of 1974.

Very truly yours,

SHUMAN SNYDER LLP


*J. Robert Shuman, Jr.*
J. Robert Shuman, Jr.


cc:  Michael Carter